UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SAM DAVIS; and AMIRA DAVIS,

                              Plaintiffs,            3:12-CV-1520 (GTS/DEP)

v.

THE STANDARD FIRE INS. CO.,

                              Defendant.
_____

APPEARANCES:                               OF COUNSEL:

LEVENE GOULDIN & THOMPSON, LLP             LAUREN KILEY SALEEBY, ESQ.
   Counsel for Plaintiffs                  MARIA E. LISI-MURRAY, ESQ.
450 Plaza Drive
Vestal, NY 13850

LAZARE POTTER & GIACOVAS, LLP              STEPHEN M. LAZARE, ESQ.
   Counsel for Defendant                   YALE H. GLAZER, ESQ.
875 Third Avenue, 28th Floor               COURTNEY A. LANZALOTTO, ESQ.
New York, NY 10022

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

    Currently before the Court, in this breach-of-contract action filed by Sam Davis and

Amira Davis ("Plaintiffs") against the Standard Fire Insurance Company ("Defendant"), are

Defendant's motion for summary judgment, and Plaintiffs' motion for summary judgment.  (Dkt.

Nos. 17, 18.)  For the reasons set forth below, Defendant's motion for summary judgment is

denied, and Plaintiffs' motion for summary judgment is granted in part and denied in part.

# I. RELEVANT BACKGROUND

## A. Plaintiffs' Claims

Generally, liberally construed, Plaintiffs' Verified Complaint alleges as follows. (Dkt. No. 1, at 7-14.) On or before September 7, 2011, a sewer pipe located in the street near Plaintiffs' home broke or kinked, causing an increase in pressure in the plumbing in Plaintiffs' home. (*Id*.) As a result, on September 7, 2011, the main water pipe in Plaintiffs' basement burst, releasing sewage into their home during the following two days, and causing extensive damage to both the home and personal property contained therein. (*Id*.) However, their insurer, Defendant, refused to fulfill its contractual duty to provide coverage for the damage to the home (up to $196,000), the damage to the personal property therein (up to $137,200), and the loss of use of that property (up to $58,800). (*Id*.) Based on these factual allegations, Plaintiffs assert two claims against Defendant: (1) a claim for a declaratory judgment; and (2) a claim of breach of contract. (*Id*.) Familiarity with the remaining factual allegations supporting these claims is assumed in this Decision and Order, which is intended primarily for the review of the parties.

## B. Parties' Briefing on Defendant's Motion

Generally, in support of its motion for summary judgment, Defendant argues that it is not liable to Plaintiffs as a matter of law because the current record establishes, without any genuine dispute, the following two facts : (1) while Plaintiffs' homeowners policy excludes coverage for damage from "water[] or water borne material[] which . . . backs up through sewers or drains" (referred to as the "anti-concurrent water exclusion"), the policy contains an endorsement that pays "up to $5,000 for direct loss caused by water which did not result from the negligence of the insured which backs up through sewers or drains or water . . ." (which amount Defendant has

already paid); and (2) here, the damage resulted from a break in a municipal sewer line in a street, which caused water and water-borne material to back up into Plaintiffs' basement through their lateral line.  (*See generally* Dkt. No. 17, Attach. 20 [Def.'s Memo. Of Law].)

Generally, in response to Defendant's motion for summary judgment, Plaintiffs argue as follows: (1) Defendant has not met its burden on its motion because it has ignored (a) the provision of the homeowner's policy (contained in the "58065-NY Endorsement") that provides coverage for Plaintiffs' loss in the event of a "mechanical breakdown [of the sewer main]" that "cause[s] water to suddenly escape from a plumbing . . . system," or in the event of "[s]ettling, cracking, . . . [or] bulging . . . of roadways . . . [or] pavements" that "cause[s] water to suddenly escape from a plumbing . . . system," (b) the provision of the homeowner's policy (contained in the "HA-300 NY Endorsement") that provides coverage for Plaintiffs' loss in the event of "[d]irect loss by . . . explosion [of the lateral line] . . . resulting from water damage," and (c) the testimony of John Lavo, an experienced insurance agent, that the policy as written is ambiguous and vague as to the coverage in this matter; and (2) the "anti-concurrent water exclusion" relied on by Defendant must be construed against Defendant because it creates an ambiguity in Plaintiffs' homeowner's insurance policy (in that reading the clause together with the HA-300 NY Endorsement would render the latter meaningless, and/or reading the clause together with the 58065-NY Endorsement would render the latter meaningless).  (*See generally* Dkt. No. 20, Attach. 13 [Plfs.' Opp'n Memo. of Law].)

Generally in its reply, Defendant argues as follows: (1) Plaintiffs have failed to refute Defendant's *prima facie* showing that the loss was excluded under the policy, because (a) Plaintiff does not dispute that the "anti-concurrent water exclusion" applies but merely argues

that the policy is ambiguous when the clause is considered with other provisions (which does not

constitute an ambiguity under New York insurance-coverage law), (b) in any event, the policy is

not ambiguous, under any reasonable interpretation of it, and (c) moreover, Plaintiffs'

"explosion" argument (i.e., arising from the HA-300 NY Endorsement) fails in that it misreads

the relevant policy provision (so that the ensuing-loss provision covers losses caused by the

excluded peril, rather than merely covering losses caused to other property wholly separate from

the defective property itself) and, in any event, there is no admissible evidence establishing that

there was an explosion; and (2) Plaintiffs' reliance on an exception to two exclusions contained

in the policy's 58065-NY Endorsement is unfounded, because (a) this language in the Policy is

limited to a claim for damaged personal property (as opposed to damage to the dwelling or other

structures), (b) an exception to an exclusion cannot provide the basis for coverage, and should

not be read so broadly as to swallow the exclusion, (c) there is no admissible record evidence

establishing that there was a "mechanical breakdown," or a "[s]ettling, cracking, . . . [or] bulging

. . . of roadways . . . [or] pavements" that caused water to "suddenly escape from a plumbing . . .

system," and (d) in any event, Paragraph A of the 58065-NY Endorsement (providing that "[w]e

do not cover any loss that results from a peril excluded or limited by this policy, even if a

covered peril is a concurrent cause of loss") precludes coverage for this loss.  (*See generally* Dkt.

No. 22, Attach. 2 [Def.'s Reply Memo. of Law].)

C.      **Parties' Briefing on Plaintiffs' Motion**

Generally, in support of their motion for summary judgment, Plaintiffs argue as follows:

(1) Plaintiffs have established their *prima facie* entitlement to summary judgment (thus shifting

the burden to Defendant) by establishing (a) the existence of an "all risk" insurance policy and

(b) physical damage to their premises; (2) Defendant have not met their resulting burden of establishing that Plaintiffs' loss is not covered under the insurance policy, because they have not established that, when strictly and narrowly construed against Defendant (and when construed together with the other provisions of the insurance policy), the exclusion for "water or water borne material . . . which backs up through sewers or drains" (referenced by Defendant as the "anti-concurrent water exclusion") clearly and unambiguously applies to the particular facts of this case; and (3) rather, the damage was caused by incidents that are covered by provisions contained in the 58065-NY Endorsement and the HA-300 NY Endorsement; and (4) based on the current record, it is undisputed that Plaintiffs incurred $105,309.77 of damages as a result of the incident of September 7, 2011, at their home. (*See generally* Dkt. No. 18, Attach. 27 [Plfs.' Memo. of Law].)

Generally, in opposition to Plaintiffs' motion for summary judgment, Defendant argues as follows: (1) Plaintiffs' motion must be denied because Defendant has already demonstrated its entitlement to summary judgment as a matter of law through the policy's unambiguous "anti-concurrent water exclusion," which bars coverage where the loss is caused by water damage, whether directly, indirectly and regardless of any other cause of event; and (2) under no circumstances are Plaintiffs entitled to summary judgment, because (a) merely establishing the "existence of an insurance policy and damage" to covered premises does not entitle an insured to judgment as a matter of law, (b) Plaintiffs' reliance on an exception to exclusions contained within the policy's 58065-NY Endorsement is unfounded (for the reasons set forth above in Part I.B. of this Decision and Order), and (c) Plaintiffs are not entitled to summary judgment on damages in that (a) they are not entitled to the amounts sought as a matter of law, (b) they are not

entitled to recovery of attorneys' fees or costs of suit under the policy, and (c) they have not proven the value of the allegedly damaged personal property as a matter of law. (*See generally* Dkt. No. 21, Attach. 12 [Def.'s Opp'n Memo. of Law].)

Generally in their reply, Plaintiffs argue as follows: (1) Plaintiffs' motion for summary judgment must be granted, because Defendant has deemed admitted numerous factual assertions contained in Plaintiffs' Rule 7.1 Statement of Material Facts by (a) failing to deny those factual assertions and/or (b) supporting denials with specific citations to the record; (2) Plaintiffs' motion for summary judgment must be granted because Defendant has failed to rebut the opinion of Plaintiffs' expert witness, Robert Harner (a licensed professional engineer), as to the cause of loss, because Defendant's insurance claims adjuster, Alexander Charlanow, is not qualified to provide an opinion as to the cause of that loss, under Fed. R. Evid. 702; (3) Plaintiffs have met their burden entitling them to summary judgment with regard to the insurance policy, because it was an "all risk" policy (in that the policy's "named peril language" was deleted and replaced with coverage "against risk of direct physical loss to property described in coverage C"), shifting the burden to Defendant to show that an exclusion contained in the policy defeats the claim (which Defendant has failed to meet); and (4) the "anti-concurrent water exclusion" clause creates an ambiguity, because (a) as explained by experienced insurance agent John Lavo, to determine if there is coverage for a loss under the policy, a reasonable person has to "go back and forth" between provisions, (b) reading the clause together with the HA-300 NY Endorsement would render the latter meaningless, and reading the clause together with the 58065-NY Endorsement would render the latter meaningless. (*See generally* Dkt. No. 24 [Plfs.' Reply Memo. of Law].)

**D.     Undisputed Material Facts**

Generally, the following facts are asserted in the parties' Statements of Material Fact ("Rule 7.1 Statements") and either expressly admitted or denied without supporting record citations by the non-movants in their Responses thereto ("Rule 7.1 Responses").  (*Compare* Dkt. No. 17, Attach. 1 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 20, Attach. 14 [Plfs.' Rule 7.1 Response]; *compare* Dkt. No. 18, Attach. 28 [Plfs.' Rule 7.1 Statement] *with* Dkt. No. 21, Attach. 13 [Def.'s Rule 7.1 Response].)

1.     Defendant issued a policy (No. 982408274 633 1) to Plaintiff Sammy Davis effective January 31, 2011, to January 31, 2012 (the "Policy") for the residence premises located in Endicott, New York (the "Premises").

2.     The Policy is 51 pages in length and is comprised of, *inter alia*, five different documents.

3.     Three of these five documents address water damage: (1) the "Homeowners 3 – Special Form" ("HO-3 Form"); (2) the Special Provisions New York Endorsement ("HA-300 NY Endorsement"); and (3) the Value Added Package-Plus NY Endorsement ("58065-NY Endorsement").

<u>Relevant Provisions of the Policy</u>

4.     More specifically, the "HO-3 Form" provides as follows, in pertinent part:

> ***SECTION I – PERILS INSURED AGAINST***
>
> ***COVERAGE A – DWELLING AND***
> ***COVERAGE B – OTHER STRUCTURES***
>
> *We insure against risks of direct physical loss to property described in* ***COVERAGE A*** *and* ***B***, ***EXCEPT***:

**A.** *WE DO NOT COVER ANY LOSS THAT RESULTS FROM A PERIL EXCLUDED OR LIMITED BY THIS POLICY, EVEN IF A COVERED PERIL IS A CONCURRENT CAUSE OF LOSS.*

**B.** *WE DO NOT COVER ANY LOSS OR DAMAGE TO YOUR DWELLING OR OTHER STRUCTURE CAUSED DIRECTLY OR INDIRECTLY, CONTRIBUTED TO, OR AGGRAVATED BY DEFECTIVE, INADEQUATE, OR FAULTY PLANNING, CONSTRUCTION, OR MAINTENANCE OF ANY PROPERTY WHETHER ON OR OFF THE **insured location** RESULTING FROM:*

**DEFECTIVE, INADEQUATE, OR FAULTY**:

**1.** *DEVELOPMENT, SUBDIVIDING, SURVEYING, OR SITING; INCLUDING GRADING, EXCAVATION, AND SOIL COMPACTION;*

**2.** *SPECIFICATIONS, BUILDING CODES OR THEIR ENFORCEMENT OR ZONING REQUIREMENTS;*

**3.** *ALTERATION, CONSTRUCTION, REPAIRS, RENOVATION, OR REMODELING;*

**4.** *MATERIALS RECOMMENDED, SELECTED, SUPPLIED, OR USED IN ALTERATION, CONSTRUCTION, REPAIRS, RENOVATION OR REMODELING;*

**5.** *MAINTENANCE.*

**C.** *WE DO NOT COVER:*

**1.** *LOSSES EXCLUDED UNDER **SECTION I - EXCLUSIONS.***

*. . .*

**7.** *LOSS CAUSED BY:*

**a.** *WEAR AND TEAR, MARRING, DETERIORATION, AND FAILURE TO MAINTAIN;*

**b.** *INHERENT VICE, LATENT DEFECT, MECHANICAL BREAKDOWN;*

> **c.** *SMOG, RUST, MOLD, WET OR DRY ROT;*
>
> . . .
>
> **f.** *SETTLING, CRACKING, SHRINKING, BULGING OR EXPANSION OF DRIVEWAYS, ROADWAYS, WALKWAYS, PAVEMENTS, PATIOS, FOUNDATIONS, WALLS, FLOORS, ROOFS OR CEILINGS;*
>
> . . .
>
> *If any of these cause water to suddenly escape from a plumbing . . . system . . . , we cover loss caused by the water. . . .*

5.      The language contained in Paragraphs C.7.b. and C.7.f. of the HO-3 Form with regard to dwellings (i.e., "COVERAGE A") and other structures (i.e., "COVERAGE B") is also contained verbatim in Paragraphs C.7.b. and C.7.f. of 58065-NY Endorsement with regard to personal property (i.e., "COVERAGE C").[1]

6.      The HO-3 Form also contains a provision covering loss of use (labeled as "COVERAGE D – LOSS OF USE").[2]

7.      The term "mechanical breakdown" is not defined in the Policy.

8.      The term "plumbing" is not defined in the Policy.

9.      The HA-300 NY Endorsement (which amends the HO-3 Form and is itself amended by the 58065-NY Endorsement) provides as follows, in pertinent part:

---

[1]      (*Compare* Dkt. No. 21, Attach. 2, at 5-6 [attaching HO-3 Form] *with* Dkt. No. 21, Attach. 4, at 2-3 [attaching 58065-NY Endorsement].)

[2]      (Dkt. No. 21, Attach. 2, at 3 [attaching HO-3 Form].)

***SECTION I – EXCLUSIONS***

*. . .*

*We do not cover any direct or indirect loss or damage caused by, resulting from, contributing to or aggravated by any of these excluded perils. Loss from any of these perils is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.*

*These exclusions apply whether or not the loss event:*

> ***(1)*** *Results in widespread damage;*

> ***(2)*** *Affects a substantial area; or*

> ***(3)*** *Occurs gradually or suddenly.*

*These exclusions also apply whether or not the loss event arises from:*

> ***(1)*** *Any acts of nature;*

> ***(2)*** *Any human action or inaction;*

> ***(3)*** *The forces of animals, plants or other living or dead organisms; or*

> ***(4)*** *Any other natural or artificial process.*

> *. . .*

**1.**  ***Ordinance or Law*** *. . .*

**2.**  ***Earth Movement*** *. . .*

**3.**  ***Water Damage****, meaning:*

> ***a.*** *Flood, surface water, ground water, storm surge, waves, wave wash, tidal water, tsunami, seche, overflow of a body of water, or spray from any of these, whether or not a result of precipitation or driven by wind;*

> ***b.*** *Water, or water-borne material, which:*

> > ***(1)*** *Backs up through sewers or drains; or*

*(2)*      *Overflows or is discharged from; a sump, sump pump or related equipment;*

*as a direct or indirect result of flood;*

*c.*      *Any water or water borne material located below the surface of the ground including water or water borne material:*

*(1)*      *Which exerts pressure on, seeps, leaks, or flows into:*

*(a)*      *Any part of the dwelling or other structures;*

*(b)*      *The foundation of the dwelling or other structures;*

*(c)*      *Any paved surface located on the **residence premises**; or*

*(d)*      *Any spa, hot tub, or swimming pool.*

*(2)*      *Which causes earth movement; or*

*d.*      *Any overflow, release migration or discharge of water in any manner from a dam, levee, dike, hurricane barrier or any water or flood control device.*

*Direct loss by fire, explosion or theft resulting from water damage will be covered.*

10.      The term "backs up" is not defined in the Policy.

11.      The term "sewers or drains" is not defined in the Policy.

12.      The term "explosion" is not defined in the Policy.

13.      While the Policy excludes coverage for water and water-borne material that backs up through sewers or drains, the 58065-NY Endorsement provides as follows, in pertinent part:

**Water Back-Up of Sewers or Drains.**

*We will pay up to $5,000 for direct loss caused by water which did not result from the negligence of the insured which backs up through sewers or drains or water that overflows from a sump.*

11

*A $250 deductible applies to this coverage. No other deductible applies to this ADDITIONAL COVERAGE.*

*The . . . Section I Exclusions [contained in Paragraph 3.b.] do not apply to this Additional Coverage.*

<u>Events Giving Rise to Damage to Plaintiffs' Property</u>

14.     Plaintiffs own the Premises.

15.     On September 7, 2011, while in her basement, Amira Davis heard water in her laundry room, looked into that room, and saw water coming out of what looked to her like her home's main water pipe.

16.     She called to her husband, who was upstairs, and told him he should probably come take a look at what was happening.

17.     Sam Davis came downstairs, observed that there was a lot of water coming out of the point where the home's (plastic) main drainage pipe joined, through a ninety-degree angle, the (steel) lateral pipe going out of the home and to the main sanitary sewer in the street; and he put a plastic bin under that point.

18.     The plastic bin started filling up in a matter of seconds, and eventually spilled over.

19.     Mrs. Davis called the Town of Union and received a recorded message; she then called 911 for assistance, and the Fire Department responded to the 911 call.

20.     The Fire Department advised that there was nothing they could do.

21.     While Mr. Davis initially thought it was more than water coming out of the pipe, he was not sure of that fact until he noticed "little things" in the water; the little things constituted sewage.

22.     Outside, in the street, the manhole in the street was spewing water three to four feet in the air.

23.     The sewage continued to flow into the home at the same "pretty heavy" rate throughout the day and evening of September 7, 2011.

24.     As Mr. Davis continued to try to stop the water and water-borne material from coming into the home, he observed that the pressure of the water and water-borne material in the lateral line was so great that it was pushing the lateral line (which again was steel) off the wall.

25.     On September 8, 2011, during visits by representatives from the Village of Endicott Water Department and the Town of Union Department of Public Works, it was discovered that the manhole was "kind of bubbling" instead of spewing three or four feet in the air, and that the lateral line had disconnected from the home's main drainage pipe.

26.     As a result, sewage was now flowing into the basement "kind of like [water from] a fire hydrant."

27.     It appeared to Mr. Davis as though the lateral line had "blown" off the wall; and it appeared to Mrs. Davis as though the lateral line had "burst."[3]

28.     Due to the severity of the ongoing problem, Mrs. Davis left the home with her three school-aged children.

29.     Mr. Davis stayed behind and attempted to contain and divert the flow of sewage into the home as best he could.

_____

[3]     (Dkt. No. 1, at 9, ¶ 11 [Plfs.' Verified Compl.]; Dkt. No. 18, Attach. 5, at 28 [attaching page "27" of Sam Davis Dep. Tr.]; Dkt. No. 18, Attach. 7, at 59 [attaching page "133" of Amira Davis Dep. Tr.].)

30.     Throughout the day on September 8, 2011, Mr. Davis used different pumping hoses to try to divert the sewage from the home.

31.     A representative of the Village of Endicott Water Department arrived but did not come into the home, instead checking the neighboring manholes.

32.     In addition, representatives from Town of Union Department of Public Works arrived, came into the home, used what they called a "snaking tool" in the lateral line, and then went back outside and looked in the manhole, but did nothing else.

33.     The sewage continued to flow into the home at the same rate of speed throughout the entirety of September 8, 2011.[4]

34.     On the morning of September 9, 2011, representatives from the Village of Endicott and the Town of Union came back out to the property.

35.     As he had done the day before, Mr. Davis directed the attention of the representatives from the Town of Union to the manhole, and told them he believed it was the problem.

36.     Finally, a crew of workers from the Town of Union arrived, dug up the street with a backhoe, and discovered that the ceramic pipe which served as the main sewer line was cracked, and that on top of it (running perpendicularly to it) lay a concrete tube which served as a drainage line.

---

[4]     (Dkt. No. 18, Attach. 5, at 29-30 [attaching pages "28" and "29" of Sam Davis Dep. Tr.].)

37.     Workers from the Town of Union repaired the ceramic pipe on September 9, 2011, and the water and sewage immediately stopped coming into the Davises' basement.[5]

38.     Before Mr. Davis opened the back door to the basement and released the sewage, the basement had filled with approximately eight to twelve inches of sewage.[6]

39.     As a result, Plaintiffs incurred damages, including damage to the house itself as well as a loss of personal property.[7]

<u>Submission, Investigation, and Denial of Claim</u>

40.     On or about September 7, 2011, Plaintiffs submitted a claim to Defendant seeking recovery for damage to the Premises.

41.     At some point between September 7 and 20, 2011, an investigation of Plaintiffs' claim was conducted by Defendant's outside property claims adjuster, Alexander Charlanow, who conducted a site visit, spoke to Plaintiffs, reviewed photographs provided by Plaintiffs, and reviewed the relevant Policy provisions.

42.     Based on his investigation, Mr. Charlanow drew the following conclusion:

> [T]he Premises was damaged when, following damage to the sewer main
> in the street outside the Premises, water and water-borne material which
> should have proceeded down the main sewage line instead backed up into

---

[5]     (Dkt. No. 18, Attach. 5, at 32-33 [attaching pages "31" and "32" of Sam Davis Dep. Tr.].)

[6]     (Dkt. No. 18, Attach. 5, at 30 [attaching page "29" of Sam Davis Dep. Tr.]; Dkt. No. 18, Attach. 8, at 59 [attaching page "208" of Amira Davis Dep. Tr.]; Dkt. No. 18, Attach. 16, at 30 [attaching page "29" from Coyle Dep. Tr.]; Dkt. No. 18, Attach. 23, at 19 [attaching photograph of basement].)

[7]     (Dkt. No. 1, at 9, ¶ 14 [Plfs.' Verified Compl.]; Dkt. No. 18, Attach. 22 [attaching estimates, invoices and receipts]; Dkt. No. 18, Attach. 23, at 4-6, 9-12, 17-35 [attaching photographs]; Dkt. No. 18, Attach. 24, at 2-28, 37-57 [attaching photographs]; *see also generally* Dkt. No. 18, Attach. 6-9 [attaching Amira Davis Dep. Tr.].)

Plaintiffs' lateral line, which runs from the Premises into the main sewage line. As the sewage backed up, it began overflowing drains, sinks and toilets in the Premises. Eventually, the force of the backup caused Plaintiffs' main lateral to disconnect, thereby causing water and water-borne material to flow directly into the Premises' basement unabated.

43.     After completing its investigation, Defendant determined that the loss was excluded by the Policy, but for the $5,000 Policy limit available under the 58065-NY Endorsement.

44.     Defendant thereby paid Plaintiffs the $5,000 limit for sewer back up, and otherwise disclaimed any further obligation to Plaintiffs based on the Policy's water exclusion.

45.     Meanwhile, between approximately September 12 and 14, 2011, Jim Coyle, the president of Disaster Clean Up, arrived at Plaintiffs' home, and observed the damage; during that time, he observed water and sewage in the ceiling and found the "clean-out cap" to the lateral line on the opposite side of the room, concluding that the cap must have come off "like a cannon" such that "it probably would have killed" anyone standing in its way.[8]

46.     By letter dated October 19, 2011, Plaintiffs' counsel advised Defendant that her firm had been retained to represent Plaintiffs and asked Defendant to reconsider its declination for amounts in excess of the $5,000 paid.

47.     By letter dated October 27, 2011, Defendant responded to Plaintiffs' counsel, noting as follows:

---

[8]     (Dkt. No. 18, Attach. 16, at 21-22, 29, 30, 54, 97, 98 [attaching pages "20," "21," "28," "29," "53," "96," and "97" from Coyle Dep. Tr.]; *cf*. Dkt. No. 18, Attach. 23, at 10, 20 [attaching photographs of lateral line bearing cap]; Dkt. No. 18, Attach. 24, at 51 [attaching photograph of absence of lateral line].)

Our investigation determined that a break in the municipal sewer line located in the street caused sewage water to back up through the insured's lateral and into their home. The water first entered the building through the insured's sinks, floor drain and 1st floor toilet. When the water pressure from the reversal of flow became too much for the drain line to handle, it caused it to rupture and allow additional sewage to back up into the basement from the lateral and main sewer line.

48.     In addition, Defendant advised Plaintiffs' counsel that it was maintaining its prior position based on the Policy's exclusion and limited $5,000 coverage for damage caused by sewage backup.

49.     By letter dated February 7, 2012, Plaintiffs' counsel again asked Defendant to reconsider its position.

50.     In that letter, counsel advised that Robert Harner, a professional engineer, had reviewed photographs of the Premises following the loss and that he determined that as a result of a sewer line break in the roadway, "sewage backed up into the [Plaintiffs'] sewage line. Eventually, the pressure in the [Plaintiffs'] sewer line became too great and caused the connection where the sewer line left the home to break . . . ."

51.     The letter attached a report from Mr. Harner dated December 16, 2011, in which Mr. Harner stated as follows, in pertinent part:

**Initial Assessment**

- On 12/4/2011, I made a site visit to [the Premises] in Endicott, NY to assess the condition of the house for a sewer main failure and sewage backup.
- The owner showed me the damage in the basement and on the main floor and had a series of photo's [sic] documenting what had happened.  In addition, photos were taken in the roadway when the repairs to the sewer main were repaired.
- It was evident that the old clay tile sewer main broke in the street causing a restriction in the line. The sewage backed

up in the line and started to flood the basement through drains within the basement.
- The sewage continued to fill the pipe and started to flood the main floor of the home through drains and toilets.
- The pressure in the line eventually caused the connection where the sewer line leaves the house to break, causing raw sewage to flow freely into the basement.
- The home was being repaired at the time of the inspection and the repairs to the sewer main in the roadway were already complete.

**Findings**

- The sewage backup/flooding which caused extensive damage to the home occurred due to an overflow in the plumbing system.
- The sewage that entered the home and was due to a sewer main break in the roadway.

52.     When asked at his deposition whether he was able to make a determination as to the cause of damage based on his assessment and conversations with Plaintiffs, Mr. Harner testified that he was, and stated as follows:

> [I]t was pretty evident that there was a repair in the road and through the photographs which I was shown and the video, it was clear that the collapsed pipe in the roadway had failed; thereby, backing up sewage in the pipe, the main pipe of the street; which then would have redirected the flow of the flow as a direct conduit into the Davis' house.

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties.  (*Id*.)

## II.     GOVERNING LEGAL STANDARDS

### A.     Standard Governing Motion for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the

18

Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

> **B.  Standards Governing Plaintiffs' Claims**

Because the parties have, in their memoranda of law, demonstrated an accurate understanding of the legal standards governing Plaintiffs' claims of declaratory judgment and breach of contract, the Court will not recite those legal standards in this Decision and Order, which is intended primarily for the review of the parties.  Rather, the Court will discuss those legal standards only where necessary below in this Decision and Order.

## III.  ANALYSIS

> **A.  Whether Defendant Is Entitled to Summary Judgment Based on the 58065-NY Endorsement's Exclusion for "Water[] or Water Borne Material[] Which . . . Backs Up Through Sewers or Drains . . . as a Direct or Indirect Result of Flood"**

After carefully considering the matter, the Court answers this question in the negative, for the reasons stated in Plaintiffs' opposition memorandum of law.  *See also, supra,* Part I.B. of this Decision and Order.  To those reasons, the Court would add only two points.

First, while the Court understands Defendant's net-balance-of-coverage argument, the Court also agrees with Plaintiff that competing provisions of the Policy (e.g., the "anti-concurrent water exclusion" and the HA-300 NY Endorsement's "explosion" provision) can, and do, create an ambiguity.  *See, e.g., Pichel v. Dryden Mut. Ins. Co.*, 986 N.Y.S.2d 268, 270-71 (N.Y. App. Div., 3d Dept. 2014) ("[W]hen the exclusion and coverage provisions at issue here are read together, an ambiguity exists in the insurance policy as to losses resulting from a backup and/or overflow from sewers, drains and/or plumbing systems.").

Second, in any event, the following alternative rationale supports the Court's ruling. The definition of the verb "back up" (as it relates to water checked by an obstruction) is "to rise and flow backward or overflow adjacent areas," as in the following sentence: "clogged pipes caused drain water to *back up* into the house." *Webster's Third New International Dictionary* at 160 (1971) (emphasis in original). The definition of the preposition "through" is (1) "movement into at one side or point and out at another and especially the opposite side of," (2) "by way of," and (3) "passage from one end or boundary to another." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/through (last visited June 25, 2014).

Reading these two phrases together, the Court finds that the plain meaning of the phrase "water[] or water borne material[] which . . . backs up through sewers or drains" is water or water-borne material that attempts to enter a sewer or drain, is prevented from doing so by an obstruction, and flows back to where it came from through that sewer or drain, and/or overflows into adjacent areas through that sewer or drain. Here, the water borne material that is the subject of Plaintiffs' insurance claim did not originate from Plaintiffs' residence but from sources up the street. As a result, the "flow backward" part of the definition does not apply, leaving only the "overflows into adjacent areas" part of the definition.

For the sake of brevity, the Court will set aside the fact that the provision in question elsewhere uses the word "overflow," suggesting the absence of the word in the term "backs up through sewers or drains" (so as to read "backs up or overflows through sewers or drains") is meaningful. More important is that, even setting aside the above-described fact, there are genuine disputes of material fact for a jury whether there was an overflow into adjacent areas.

For example, based on the current record, it is unclear how far from the obstruction Plaintiffs' basement is located, and whether that basement is an "area" that is "adjacent" to the municipal sewer line in the street.

Moreover, the Policy does not define the term "sewer or drain." Based on the current record, it is unclear whether Plaintiffs' lateral line is part of the "sewers or drains" through which the water-borne material had flowed before it "backed up" (i.e., the municipal sewer line in the street). If it is not, it is difficult to understand how the "back[] up" occurred "through sewers or drains" (as opposed to occurring "from one sewer or drain to a separate sewer or drain").

Finally, the provision in question requires that the "back[ing] up" of water-borne material is "a direct or indirect result of flood." Based on the current record, it is unclear whether the moisture, which appears to have caused the concrete storm drainage line to settle onto the municipal sewer line, was "the indirect result of flood," as opposed to something else (e.g., the accumulation of water over time, a crack in the roadway and/or the concrete drainage line, etc.).

For all of these reasons, the Court denies Defendant's motion.

**B.      Whether Plaintiffs Are Entitled to Summary Judgment on the Issue of Liability, Based on One or More of the Three Provisions Relied on by Plaintiffs[9]**

After carefully considering the matter, the Court answers this question in the affirmative predominantly for the reasons stated in Plaintiffs' memoranda of law. *See also, supra,* Parts I.C. and I.B. of this Decision and Order.

_____

        [9]      Again, these three provisions are as follows: (1) the 58065-NY Endorsement's provision covering loss in the event of a "mechanical breakdown [of the sewer main]" that "cause[s] water to suddenly escape from a plumbing . . . system," (2) the 58065-NY Endorsement's provision covering loss in the event of "[s]ettling, cracking, . . . [or] bulging . . . of roadways . . . [or] pavements" that "cause[s] water to suddenly escape from a plumbing . . . system," and/or (3) the HA-300 NY Endorsement's provision covering loss in the event of "[d]irect loss by . . . explosion [of the lateral line] . . . resulting from water damage."

More specifically, regarding the 58065-NY Endorsement's provision covering loss in the event of a "mechanical breakdown [of the sewer main]" that "cause[s] water to suddenly escape from a plumbing . . . system," Defendant largely hinges its rejection of this provision on the assertion that "mechanical" things have "moving parts," and here the sewer line had no moving parts. As an initial matter, the Court has some difficulty finding, as a matter of law, that "mechanical" things always have moving parts. The definition of the word "mechanical" is "of, relating to, or concerned with machinery *or tools*." *Webster's Third New International Dictionary* at 1400 (1971) (emphasis added). The definition of the word "tool" is simply "an implement or *object* used in performing an operation or carrying on work of any kind." *Webster's Third New International Dictionary* at 2408 (1971) (emphasis added). Moreover, the Court has some difficulty finding that, based on the current record, a rational fact-finder could conclude that the crushing collapse of a concrete drainage line onto a lower ceramic sewer line (which were constructed so as to keep the former line separate from the latter line), and the diversion of sewage from the ceramic sewer line and into a home's lateral line (which were construed so as to direct the flow of that sewage away from a home in part through the use of an inclined plane), did not involve a mechanical breakdown. However, the Court need not, and does not, resolve these issues in deciding Plaintiffs' motion, given the merit of their other arguments.

Regarding the 58065-NY Endorsement's provision covering loss in the event of "[s]ettling, cracking, . . . [or] bulging . . . of roadways . . . [or] pavements" that "cause[s] water to suddenly escape from a plumbing . . . system," for the reasons offered in Plaintiffs' memoranda of law, the Court respectfully rejects Defendant's arguments that (1) this language in

the Policy is limited to a claim for damaged personal property (as opposed to damage to the dwelling or other structures), (2) the exception to the exclusion cannot provide the basis for recovery to Plaintiffs for that damaged personal property, (3) based on the current record, a rational fact finder could conclude that there was no "[s]ettling, cracking, . . . [or] bulging . . . of roadways . . . [or] pavements" that caused water to "suddenly escape from a plumbing . . . system," and (4) Paragraph A of the 58065-NY Endorsement (providing that "[w]e do not cover any loss that results from a peril excluded or limited by the Policy, even if a covered peril is a concurrent cause of loss") precludes coverage under Paragraph C.7. of the 58065-NY Endorsement (providing that, "[i]f . . . [settling, cracking or bulging of roadways or pavements] cause[s] water to suddenly escape from a plumbing . . . . system . . . , we cover loss caused by the water"). *See, supra,* Parts I.B. and I.C. of this Decision and Order. To Plaintiffs' analysis, the Court would merely add two points: (1) regarding Defendant's first argument, Defendant appears to overlook the fact the relevant language contained in 58065-NY Endorsement with regard to personal property (i.e., "Coverage C") is also contained, verbatim, in HO-3–with regard to dwellings (i.e., "Coverage A") and other structures (i.e., "Coverage B"); and (2) regarding Defendant's fourth argument, the Court cannot construe the convoluted language contained in Paragraph A in the manner requested by Defendant without rendering the clear language in Paragraph C.7. meaningless. <u>For all of these reasons, the Court finds that Plaintiffs have demonstrated an entitlement, as a matter of law, to coverage for damage to their home (up to $196,000), the damage to the personal property therein (up to $137,200), and the loss of use of that property (up to $58,800).</u>

Finally, regarding the HA-300 NY Endorsement's provision covering loss in the event of "[d]irect loss by . . . explosion [of the lateral line] . . . resulting from water damage," the Court respectfully rejects Defendant's argument that, based on the current record, a rational fact finder could conclude that there was no explosion. From the available photographs and the testimony of Mr. Davis, Mrs. Davis, Mr. Coyle, Mr. Harner and even Mr. Charlanow, it appears that there was, however minor in the eyes of Defendant, a violent expansion or bursting caused by a sudden release of energy from an escape of liquid and/or material under pressure; and Defendant has pointed to no admissible record evidence that such an event did not occur.[10] Moreover, the Court finds, for the reasons offered in Plaintiffs' memoranda of law (including their reliance on *Platek v. Town of Hamburg*, 948 N.Y.S.2d 797 [N.Y. App. Div., 4th Dept. 2012]), that the provision in question provides coverage for (1) the loss of the property that exploded (i.e., the lateral line), and (2) losses that would not have occurred without the explosion. The Court need not more specifically define those losses, because all types of requested losses have already been found to be covered (i.e., by the 58065-NY Endorsement's provision covering loss in the event of "[s]ettling, cracking, . . . [or] bulging . . . of roadways . . . [or] pavements" that "cause[s]

---

[10]     While Defendant cites pages 26, 27 and 72 of Mr. Davis' deposition transcript for the fact that the lateral line "worked its way out of the wall" on September 8, that transcript actually supports the conclusion that the lateral line (1) "was slowly working its way out" of the wall on September 7 and (2) "had blown off the wall" at some point on September 8. (*Compare* Dkt. No. 22, Attach. 2, at 11 [attaching page "7" of Def.'s Reply Memo. of Law] *with* Dkt. No. 18, Attach. 5, at 27-28, 73 [attaching pages "26," "27," and "72" of Sam Davis Dep. Tr.].) Moreover, while Defendant takes issue with whether the "clean-out cap" was blown off the lateral line on September 8, the evidence Defendant relies on (Mr. Davis' deposition testimony) is slightly ambiguous with regard to whether that cap "ever c[a]me off" *before* September 8 or *on* September 8; and it is wholly silent as to how Mr. Coyle could have found it on the opposite side of the room four to six days later. (Dkt. No. 18, Attach. 5, and 76 [attaching page "77" of Sam Davis Dep. Tr.].) In any event, and more importantly, the detachment of the clean-out cap is hardly necessary for an explosion to have occurred (such that the absence of a detachment does not undermine the existence of an explosion).

water to suddenly escape from a plumbing . . . system"). Rather, this finding merely constitutes an alternative basis for a portion of the Court's decision.

### c. Whether Plaintiffs Are Entitled to Summary Judgment on the Issue of Damages, Based on the Current Record

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendant's opposition memorandum of law. (Dkt. No. 21, Attach. 12 [Def.'s Opp'n Memo. of Law.].) *See also, supra,* Part I.C. of this Decision and Order. The Court would add only the following two points.

First, while Defendant made the usually perilous decision not to adduce evidence controverting Plaintiffs' factual assertions regarding damages (*compare* Dkt. No. 18, Attach. 28, at ¶¶ 102-104 [Plfs.' Rule 7.1 Statement] *with* Dkt. No. 21, Attach. 13, at ¶¶ 102-104 [Def.'s Rule 7.1 Response]), Plaintiffs provided no *specific* citation to the 113 pages of estimates, invoices and receipts generally cited in support of their factual assertions regarding damages (*see* Dkt. No. 18, Attach. 22), in violation of the requirement of Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court. The Court declines to *sua sponte* scour those pages, at its own peril, for support of the material facts asserted.[11]

---

[11] *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *Green v. Blood*, 07-CV-0351, 2013 WL 2250370, at *4 (N.D.N.Y. May 22, 2013) (Suddaby, J.) ("It was not Magistrate Judge Peebles' duty to scour the affidavits and exhibits presented by the parties on Defendant's motion for summary judgment-much less the 387 pages contained a random docket entry existing outside of the record on Defendant's motion-in search for a dispute of material fact."); *Continental Ins. Co. v. Coyne Int'l Enter. Corp.*, 700 F. Supp.2d 207, 218 (N.D .N.Y. 2010) (Suddaby, J.) ("It is not the Court's duty to *sua sponte* sift through a non-movant's record evidence for genuine issues of material fact."); *Murray v. Palmer*, 03-CV-1010, 2008 WL 2522324, at *4, 18 & n. 9 (N.D.N.Y. June 20, 2008) (Hurd, J. adopting Lowe, M.J.) ("[T]he Court has no duty to *sua sponte* scour the 209 pages that comprise Plaintiff's 'affidavit and exhibits' for proof of a dispute of material fact"); *Williamson v. Goord*, 02-CV-

Second, the Court agrees with Defendant that Plaintiffs are not entitled to the recovery of attorneys' fees or costs of suit under the Policy, for the reasons stated in Defendant's opposition memorandum of law.  (Dkt. No. 21, Attach. 12, at 28-29 [attaching pages "23" and "24" of Def.'s Opp'n Memo. of Law.].)  The Court notes that, in their reply memorandum of law, Plaintiffs did not even bother to respond to Defendant's challenge to the recovery of those fees and costs.  (Dkt. No. 24 [Plfs.' Reply Memo. of Law].)

For all these reasons, the issue of damages shall proceed to trial.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 17) is **DENIED**; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment (Dkt. No. 18) is **GRANTED in part** and **DENIED in part**, in accordance with Part III of this Decision and Order:

(1) Plaintiffs are entitled to coverage for damage to their home, the damage to the personal property therein, and the loss of use of that property;

(2) Plaintiffs are not entitled to summary judgment on the issue of damages; and

(3) Plaintiffs are not entitled to the recovery of attorneys' fees or costs of suit under the Policy; and it is further

**ORDERED** that counsel are directed to appear on **OCTOBER 15, 2014  at 11:00 a.m.** in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time.

_____

0521, 2006 WL 1977438, at *9 (N.D.N.Y. July 11, 2006) (Lowe, M .J., adopted by Sharpe, J.) ("The Court has no duty to assiduously search the record for evidence creating a dispute of material fact, where a plaintiff has failed to file a response to a Statement of Material Facts.").

Plaintiff is further directed to forward a written settlement demand to defendants no later than

**SEPTEMBER 12, 2014**, and the parties are directed to engage in meaningful settlement

negotiations prior to the conference.  In the event that counsel feel settlement is unlikely, counsel

may request to participate via telephone conference for the limited purpose of scheduling a trial

date by electronically filing a letter request at least one week prior to the scheduled conference.

Dated: August 19, 2014
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge